Oral argument not to exceed 15 minutes per side. Mr. Sadawa for the Defendant Appellant. Good morning, Your Honors. If it pleases this honorable court, I would like to reserve five minutes for rebuttal. You may. Thank you, Your Honor. Your Honor, this is a jury-based case. This is a conviction of three counts of innocence, receipt, distribution, and possession of child pornography. The critical issue at trial was who possessed or, in many cases, downloaded the child pornography in question. The primary vehicle, although there were others including social media or social dating evidence presented, was the use of what is now commonly known as historical cell phone data to locate the cell phone belonging to the three residents of the house as well as a boyfriend of one of the adult children who lived at that house who was a frequent visitor or, I don't want to say resident, but guest. That cell phone analysis was subject to pretrial litigation. The defense filed a motion asking the court to not allow the testimony under Daubert and Comotire. For various procedural reasons, the motion was stricken as well as the government's response. The defense refiled the motion, this time asking formally for a Daubert hearing, and without a hearing, the court ruled the evidence admissible. There is significant, and it's cited all over the brief, issues in relationship to historical cell phone data and the use of it in court, some of which was even acknowledged by the government's first witness or first expert, Agent Hess. The defense, I think, inartfully crafted one of its arguments in suggesting that Agent Hess was not called as an expert. What the defense is trying to suggest to your honors is that there's kind of a want your cake and eat it too type of balancing going on here. The way that Agent Hess was questioned and the method at which several objections by the defense were dealt with by the court suggested that Agent Hess was simply an individual who did testing or reviewed reports related to the usage or the towers being used by cell phones, but at the same time was opining on the meaning of that cell phone usage. Your honors, the thrust of the evidence is one of the primary red flags that has been identified in Daubert, which is the use of experience and anecdote to justify scientific knowledge. There's no question that this analysis and opinion falls under 702. There's no question that it's subject to a Daubert analysis, the court conducted one, but it did so without the benefit of a hearing, without hearing from both sides' witnesses. And perhaps one of the very troubling... Is that always required to give a Daubert analysis? No. I mean, you don't have to hold a hearing. That's clear, but... Let me ask you, because you said something that piqued my interest, because it sounded like you started out by saying that Agent Hess had had some testimony that was troublesome for the government. Is that what you said, and can you point to it? Judge, if I did, I didn't mean to say that. What I meant to say is that the testimony regarding anecdote and his use of anecdote is troublesome in the context of a case where the proof of who downloaded the child pornography is circumstantial. There's no direct evidence of it, and the use of this historical cell phone data was the primary vehicle under which that was done. And, Your Honor, again, the fact of the matter is that, and again, there are other issues in the brief, for example, the denial of the alibi and some of the handling of the rebuttal witnesses. The reason I think these are all important is when looked at together in conjunction with one another, I think it helps Your Honors analyze whether or not the district court's rulings as they relate to these individuals were, in fact, an abuse of discretion. So, for example, when the defense informed the court at the close of the government proofs, I've been made aware of some alibi witnesses. The court's ruling incorporated the cell phone historical data analysis, suggesting that it would be unfair to the government now that the proofs have been closed. They could have shown whether or not the use of the cell phone in Dearborn, Michigan, which is approximately, I don't know, 5 to 10 miles from Canton, Michigan, where the defendant lived. They could have presented that testimony through Agent Hess. So even part of the judge's analysis of issue, I believe, three of our briefs relating to alibi or the denial of the defense's ability to call those witnesses, in analyzing that, the district court judge sort of hanging over this case like a gargoyle is this evidence, this cell phone. I had the feeling that part of it was that now having heard the evidence as to where certain people might and might not be, it would be easier for you now to provide alibi witnesses that were conforming with that, whereas if you'd had to present them earlier, they might not have conformed with the testimony. I was not a trial judge. I'm not saying you individually, but that's one of the reasons, I think. I'm not a trial judge, unlike my two colleagues, but I thought that was one of the reasons you had to disclose alibi witnesses early on so that the alibi couldn't tailor to the testimony. Well, also so that the alibi can be investigated. Yeah. Before he's heard the arguments made by the government and adopted by the court. Including their cell phone records, maybe. My point is this. The district court denied the defense late disclosure of alibi witnesses. Some of the reasons have been discussed by your honors. But in analyzing whether or not it was an abuse of discretion to not make that decision, but the defense would submit, more importantly, when analyzing the court's handling of the historical cell phone issue, I think it's important to keep in mind, as part of that analysis, that even the district court judge used its handling of the historical cell phone data in its analysis of the denial of the alibi. With regard to the historical cell phone data then, is it your submission or argument that it's simply bogus, that in terms of being able to say that a certain call was made from a certain wide area radius. You can argue a bit about exactly how wide, what direction. Are you saying that's simply bogus, or that, for example, the parameters, if they said it was within a two-mile radius, you say it was really a four-mile radius. Can you distinguish between the two of those? Because the first would seem to be a daubered question. The second would seem to go to weight and accuracy. I understand the court's question, and I think that, theoretically, you are right. My answer would be as follows. When you look at, in my mind, whether or not a daubered hearing was held is incredibly important to the answering of your honors question. Had those issues been fully developed by way of a pre-trial daubered hearing outside the presence of the jury, where those very issues were explored, then whether or not the district court abused its discretion in admitting the evidence, I think would be easier to answer. Again, as I understand daubered, you don't have to have a daubered hearing to determine the difference between one interpretation of a scientific principle and another interpretation. You go back to what I said. If the defense is, you say you can pinpoint it within two miles, I say you can't pinpoint it within only four miles, that doesn't, to me, say you can't testify. You can attack that. So my follow-up question was going to be, did the defense present or could it present anything that says, okay, you say X and I give a radius so wide that it can put it all the way back to the Yorktown house? And the reason I ask that is that's not the way I read the record. It's not that the government wants a tight radius and you want a bigger radius that would take them back to the Yorktown house. Am I wrong about that? Your Honor, I'll answer the question and then finish it, I guess, on rebuttal. But I guess the critical inquiry your Honor asks or the critical part of the inquiry that your Honor asks is this. If, in fact, the differences within, I think, the government's, one of the government's experts testified a plus or minus error rate of 5,000 meters and a different one, the second, the rebuttal witness, testified approximately 2 miles. The defense witness testified that it could be hundreds of miles. I mean, it could be off by a factor of 10 or more. So when your Honors review that, I think it's important to keep in mind not just the government's use of that second expert on rebuttal only, but also the limitations placed on the defense expert through the government's objections and the court's rulings on those issues. Thank you. My colleagues have any further questions? Okay, thank you. You'll have your time for rebuttal. Thank you, Your Honor. Good morning. May it please the Court, Sarah Woodward on behalf of the United States. Mr. Sotawa just argued or stated in his argument that the cell phone records in this case were the primary piece of evidence against the defendant. And before I go into his specific issues he raises on appeal, I just want to point out that they were not the primary piece of evidence. They were one piece of evidence, and certainly the evidence that was most vigorously challenged by the defense, but not the only evidence. It's important to realize that the child pornography in this case was recovered from the defendant's home from his computer, and there were over 8,000 images of it. When you say his computer, does that mean that you had evidence that he bought it or he owned it as opposed to the other members in the House? This was the defendant's home. This computer was located in a room right next to his bedroom. He was the patriarch of this family. We didn't have evidence that he purchased the computer, but it would be a fair inference to draw. He had control over this entire home, and his adult children resided there. And he admitted that he used this computer and that this was the primary computer that he used. And the child pornography evidence also showed that there was one person responsible for intentionally downloading those 8,000 images, and we know that from the type of images, the type of downloading, and the search terms that were used. Why do you say that was one person, simply because there's a similarity among the evidence and the search terms? I mean, it's not that he had a different IP address or a different logon? Correct. It was one computer. The computer that distributed was the same one recovered from the House, and it was the consistency of images. They were all prepubescent girls, similar type of images, not, for example, a scatter shot or two different types of child pornography. So I think we can conclude from the fact that it's illegal, the consistency of the images, the search terms that were used, and that they were all downloaded through FrostWire, the peer-to-peer program, that it's one person who's doing this. What's the significance of FrostWire? The significance is that they were not downloaded through the Internet, which could be another way that they would be downloaded, or they weren't accidentally accessed through viewing adult pornography. FrostWire is a particular peer-to-peer program, and the fact that all of these images were downloaded in the same way is further evidence that it was one person who was engaging in this illegal activity. Wasn't there some other evidence that the defendant had another account that he used that was his account on a different subject that was being used at the same time? I can't recall the name of it. No, I don't believe so, or I'm not sure what you're referring to. He had one Match.com account. I think that's the one. And there was evidence that there was another older Match.com account registered to another email address, but there was only one Match.com account relevant to the downloading of child pornography in this case. And that was the defendant's? Defendant's, correct. And it was used at the same time? Correct. So that would be consistent with him being there? Exactly. And that was his account, not the account of the daughter or the boyfriend? Correct. And, in fact, they didn't even have Match.com accounts, the daughter or the boyfriend. That's what I'm referring to. And that's exactly where I was going, that it was one person who intentionally downloaded the child pornography, and that that individual visited Match.com at relevant times, in close proximity to the downloading of child pornography. So the universe of individuals that could be responsible for this activity was, of course, the defendant, and then the other residents of the home, his adult son, his adult daughter, and her boyfriend, who occasionally stayed there. The adult son's work records on four of the seven days in May where child pornographic activity occurred on the computer showed that he was at work. And then the cell phone records were used to further identify who was the one who had a pattern of being home at the time that the child pornography was downloaded. And the only one who had records consistent with being in the Yorktown residence was the defendant. And that was for each of the seven days in May, while the other individuals, if they made or received calls at that time, had cell phone records placing them in areas inconsistent with the home. In response to the issue defendant raised... From a biological point of view, the government's data would show that these other people could not have been in the home. They did not show that the defendant was in the home, just that he could have been. That's right. Is that a fair reading? That is fair, and that is what Agent Hess testified to. He was only able to say that the defendant's cell phone records were consistent with him being located in the home, but could not pinpoint with any specificity and did not attempt to pinpoint whether he was in the home or not. So that the exclusion of the others is really by far the more powerful data. That is, if you did not have that, the fact that he could have been in the home would not have been nearly as strong because he could have been down the block, he could have been at the Starbucks, whatever. He could have been, and it was also the pattern. It was the fact that this was not one day or even five days. It was seven dates in May, and there was also testimony about approximately nine days in April where this activity occurred as well. And on each and every one of those days, the defendant's cell phone records were consistent with him being located in the home. The court did not hold a Daubert hearing, and as this panel has already stated, that is certainly not required. Instead, the trial court is required to make an initial assessment of the relevance and the reliability, and that's exactly what the trial court did here. There was extensive briefing by both parties on this issue, and when the court considered the testimony of Agent Hess, it had the defendant's motion, the supporting materials the defendant had provided, and also a supplemental brief that the defendant filed after oral argument, as well as the government's brief, Agent Hess's report, and his CV. And the court determined that the proposed testimony was reliable for some of the reasons we've just discussed, that it showed that the defendant could be physically present in the house or made that more likely, and that it also was relevant to whether the three other individuals could have been present in the home. And then the court also concluded that Agent Hess's proposed testimony was reliable and specifically noted that the government was not offering his testimony to pinpoint him in a specific location and that it was just testimony that he could be in the general area or location of his home. I think defense counsel has conceded that it's not that Agent Hess was a fact witness. He certainly was not a fact witness. The court was not asked to, and counsel did not ask the court to qualify him as an expert. Instead, his qualifying and foundational information was provided, and then we proceeded to opinion testimony. And the defendant did not object at that point, but had objected and filed his motion so strenuously before that I'm not arguing that he waived the right to raise this on appeal. And I do agree with you, Judge Boggs, that much of the defendant's argument on appeal goes to weight and not admissibility and is simply an attack on this type of evidence. And that was strenuously presented during trial through the use of a defense expert that criticized Agent Hess's conclusions. Let me ask you about the defense expert because then they object, the other side objects to the fact that you had a rebuttal witness that they certainly cross-examined. Did they ask for surrebuttal or recalling Schenck? They did not. And the rebuttal expert here was real rebuttal is what it's referred to in the Benedict case, or classic or textbook rebuttal. It was to respond directly to the new theory presented by the defense expert, which was a dramatically different theory than the theory provided by Agent Hess. Mr. Schenck testified that cell phones could use towers up to 30 miles away, that a tower could serve a square radius of up to 460 miles, and that you could make no conclusions about anyone's location within a smaller area than that very, very large footprint by looking at cell phone records. And I think it's important to note that when the court ruled on the government's rebuttal witness, the district court limited the government to specifically responding to what Mr. Schenck had testified to. And the district court found that the rebuttal witness, Mr. Smyk, could testify about the formula that Mr. Schenck presented, about the coverage of up to 31 miles by a particular cell phone tower, about how cell phone towers and cell phones communicate, about the coverage area for the towers it issues, and about two things that Mr. Schenck testified about that were practices of cell phone companies. Schenck specifically said that cell phone companies do not tilt their antenna toward the ground to restrict coverage of the tower and improve service, and that a mobile switching center reroutes the call before the call is connected based on call volume, not proximity. And he said to not do those things would be business foolish. These two areas are important because the government did not have any idea what Mr. Schenck would say and certainly didn't know his opinions about the tilt of the antenna and the mobile switching center. The Rule 16 notice provided by the defendant was very, very brief. And so Mr. Smyk was called and responded directly to those two areas and said that, in fact, the towers at issue here are tilted towards the earth, that he was the individual who built this cell phone tower network, and that the towers and the network are built to provide concentrated coverage because that improves service for cell phone users, and that a call usually uses the closest tower, but the tower that it selects to make a call is the one recorded in the originating tower information, not a call that's been rerouted by the mobile switching center. So that was directly in response to Mr. Schenck's testimony. The defendant tries to characterize the government's rebuttal witness as backloading, and that's just simply not true. Had Schenck not testified, the government would not have called a rebuttal witness. And throughout trial, although the government was on notice that Mr. Schenck might testify, we absolutely did not know whether he would, in fact, take the stand or not. And defense counsel told the court on day five, I won't know until Hess finishes whether I'm going to need Mr. Schenck or not, and that it was possible that he might testify. And then on day seven, he did, in fact, testify. And it was that day that the government indicated that it would have a rebuttal witness to call. I'll address the alibi witness briefly. Mr. Satawa stated that somehow the court's consideration of these cell phone records bled in or influenced his consideration of the alibi, and it's true that they're related, but that's because one of the things the district court had to do was evaluate the prejudice to the government from the late notice. And because the trial testimony had come in and it was very focused on call detail records and historical cell site analysis, those two issues became linked because it was in the context of the trial that the court evaluated the prejudice. And it's not disputed in this case that the government asked for notice of alibi and that the notice of alibi request was very, very specific to seven dates and times in May of 2011. And it's also not disputed that the defense never responded to that request. Trial began on June 18, and it wasn't until the government rested on June 26, which was approximately day six of trial, that the government learned about these potential witnesses. And it was only in response to court inquiry about two names that had been added to the list that had not been read to the jury that they were ever identified as potential alibi witnesses. So it was only after the court asked. The defense counsel and the defendant never identified them for the government. And then when this issue was argued, three days after that, during the defendant's case in chief, at that time, defendant and his counsel still hadn't interviewed these witnesses. And they told the district court, we haven't had an opportunity to interview these witnesses, so I can't necessarily represent to the court that they won't remember specific dates, but it's my understanding that they will not remember specific dates. And the district court carefully applied the factors set forth in United States v. White when deciding to impose the sanction of exclusion of these witnesses and evaluated the amount of prejudice that resulted from the failure to disclose. And I think it's important to note that this claim that the defendant was painting at night at Oakwood Hospital would be incredibly difficult for the government to follow up on after it had rested and during the trial. Oakwood Hospital is an extremely large organization, and there were no details about where he was painting or who might have had any records related to this or anything other than these individuals might say that the defendant was with them sometimes at night in May. So the prejudice to the government was considerable and weighed in favor of exclusion. The reason for the nondisclosure was that the defendant didn't talk to his friend and his brother about where he was due to the nature of the charges in this case. And the court found correctly that that was not a justifiable reason to not identify these individuals. And then, of course, the extent to which the harm was mitigated by the subsequent events, and the court looked at the timing of this disclosure, and it was just simply inexcusable. So all of the factors under White weighed in favor of exclusion, and the district court properly excluded the defense alibi witnesses. I don't have much time left, but if the court has any questions for me. Thank you. Thank you. Mr. Tawa, you have five minutes for rebuttal. Thank you, Your Honors. Before I get back to the cell phone analysis, I'm going to briefly address a few points made by the government. First, they talked about this being the defendant's house, the defendant's computer, and the defendant being the patriarch. The record made at the trial is very clear that the computer was not password protected, that every resident in that house had not only access to it but used the computer. The government talks, again, about there being 8,000. Is there any evidence about this Match.com, which was apparently used at least on some occasions when the computer was being used? There was evidence presented on some of the relevant dates that Match.com was accessed in the same general time as some of the child pornography either began to be downloaded or attempted to be downloaded. This may expose my naivete or sheltered life, but Match.com, is that one of those dating things? Yes, Your Honor. Yes, it is. And the defendant, was he single or married? Your Honor, the evidence at the trial was that the defendant did have a Match.com account, and he was not married. In fact, I believe one of the women he met on Match.com was a witness at the trial. Wouldn't there be some additional circumstantial evidence? Certainly. Would he be more likely to use that account than the others? I think I acknowledged in my first argument that the cell phone was the primary but not the sole evidence of who was accessing the computer and who was downloading the child pornography. The government talked about the 8,000 images, and again, the idea is that in talking about what those images showed, I don't know that anyone ever denied that the images were child pornography and that the images did not satisfy the definition of child pornography. But again, consistent with what happened at trial, this idea that there were so many of these images and that the images were so bad, so therefore the defendant needs to be convicted, is, again, the danger you fall into when we look at cases like this. And that is, I think, underneath the surface of the defense argument, as I will freely acknowledge to Your Honors the following. There seems to be developing stronger and stronger this idea that there's two Dalberts. There's one in criminal cases when it's advanced by the defense and one in civil cases when advanced by a defendant in a civil case. And, Your Honor, I would submit that it is not far-fetched to suggest that the district court's analysis of the historical cell phone records would have been different had the motion and the challenge been filed by a defendant in a civil case, if the defendant were General Motors or Ford Motor Company, than it would have been with an individual charged with possession and receipt of child pornography. Again, Your Honor, there is no question that historical cell phone data is extraordinarily, it's subject to an extraordinary amount of controversy. It is criticized. There are several articles and cases cited in the defense brief to that proposition. Pretty much, whether it's a specific location or a much broader location, and the broader the location or the scope of location, the more reliable the evidence is. I think, and that's similar to Judge Boggs' question earlier. And my answer is this. It's important to remember that this is not designed for a forensic purpose. Its intent was never for it to be used forensically. It's designed for businesses to track. But isn't the reliability dependent somewhat on your aim, what you're trying to prove? And the less specific or the more general your proof, the more reliable it is? Listen to what the government said on their argument. The government said the testimony was not being offered to pinpoint the defendant's location. That was a quote of the government's argument just a minute ago.  The defendant was the only one who had a pattern of being in the Yorktown residence. I'm sorry. The only person who had a pattern of being in the Yorktown residence during the same time of the download of the child pornography was the defendant. That's exactly true. You are pinpointing the location of the defendant. Are you quoting that from trial transcript? Or are you quoting what she just said? That's what the government said, but I believe the government's point on that is a fair summary of what Agent Hess said and what the testimony was at the trial. I don't think that's what the government is saying. There's no question the computer was being used. The only issue is who was using it and who was in that cone of potential use. And if you exclude people from that cone by putting them 15 miles away, it seemed to me fairly reliable, as opposed to saying he was there at that computer on that day. It seemed like they were two different things, and that's where the current debate is. And that debate would be properly preserved and before Your Honors had a hearing been held. My answer to Your Honor, and I know I have to sum up, so I will say one last thing. Your Honor, my answer ultimately to both your question, Judge Huck, and your question, Judge Boggs, is this. In this case, a Daubert hearing was required. Under these facts, under this unique set of circumstances, under using this technology for the purpose that it was used for, in this case, it was an abuse of discretion not to have held the hearing. Let me go, not holding your adversary to what you quoted her to without a transcript, and she's not before the jury. If before the jury they had said, and this shows that he was in the house, which I don't think it does, you would have a stronger case, and presumably cross-examination either could or should have said, an agent, are you saying that this demonstrates he was in the house or only that he was within whatever your number is, a mile? And the agent would have had to say he was within a mile. I believe the agent did. I don't believe the agent ever said he was specifically in the house. Very good. We'll look at it. Thank you, counsel. We appreciate it. The case will be submitted, and the clerk may call the next case.